In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3024

SCOTT WEIGLE and APRIL WEIGLE,

*Plaintiffs-Appellants*,

*v.*

SPX CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-cv-01400-LJM-MJD — **Larry J. McKinney**, *Judge.*

No. 12-3025

JOHN MOORE, II and CORINNE MOORE,

*Plaintiffs-Appellants*,

*v.*

SPX CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-00822-LJM-MJD — **Larry J. McKinney**, *Judge.*

ARGUED FEBRUARY 12, 2013 — DECIDED SEPTEMBER 6, 2013

Before RIPPLE and TINDER, *Circuit Judges*, and ZAGEL, *District Judge.**

TINDER, *Circuit Judge.* This suit under the diversity jurisdiction stems from an incident in which a semi-truck trailer fell off of its support stands and on top of Scott Weigle and John Moore, the two mechanics who were working on the trailer. Weigle and Moore each sued SPX Corporation, the designer of the support stands, asserting claims of inadequate warnings and defective design under the Indiana Product Liability Act (IPLA), Ind. Code § 34-20-1-1 *et seq.* The district court granted summary judgment for SPX on all claims, finding that the warnings were adequate as a matter of law and that, as a result, the support stands were not defective under Indiana law. We affirm the district court's judgments on the inadequate-warnings claims, but we vacate the judgments on the defective-design claims and remand for further proceedings.

## I.Background

### A. *Accident & Nature of Support Stands*

At the time of the underlying incident, Weigle and Moore were professional mechanics employed by Truckers 24-Hour

---

* The Honorable James B. Zagel of the Northern District of Illinois, sitting by designation.

Road Service, Inc., in Indianapolis, Indiana. Both had consider-able experience: Weigle had been a mechanic at Truckers since 1997, and Moore had been a mechanic at Truckers since 2001.

On July 31, 2009, Weigle and Moore undertook a job to rebuild the braking system on a semi-truck trailer. In prepara-tion, Weigle used an airlift to raise the rear portion of the trailer and then lowered the trailer onto two support stands; the front of the trailer was supported by the trailer's built-in dolly legs. Weigle had already begun working on the trailer when Moore came over to assist. The trailer somehow moved as both mechanics were working underneath it, causing the support stands to tip over and the trailer to come crashing down.

It is undisputed that the two support stands were OTC Tools 1779A support stands designed by SPX. These support stands consist of a conical base, an extension tube, and a support pin:



(Though omitted from this diagram, the support pin is tethered to the base by a chain and "S" hook.) These are heavy-duty support stands; the conical base is approximately 16¾ inches tall and approximately 15⅝ inches in diameter, the extension

tube is approximately 33¼ inches tall and approximately 2⅞ inches in diameter, and the stand has a capacity rating of 12 tons when used properly. There are eight holes along the extension tube, each of which is roughly ¾ inch in diameter. To adjust the height, the user places the support pin into the appropriate hole and allows the pin to rest on top of the base. The base lacks a bottom, so if the support pin is not used the extension tube will touch the ground. When this happens, the support stand becomes unstable because the weight of the load is not distributed to the broad conical base but instead rests almost entirely on the narrow extension tube.

The "Parts List and Operating Instructions" accompanying the support stands contains the following relevant safety precautions and operating instructions:

### Safety Precautions

CAUTION: To prevent personal injury,

… .

- Always use the support pin, which must be completely inserted through the support stand extension tube.

… .

- The load and support stand(s) must be stable before beginning any repairs underneath the load.

**Operating Instructions**

… .

4. Insert the support pin … completely through both walls of the extension tube.

**IMPORTANT: Always check the placement of the support pin before lowering a load onto a support stand.**

… .

**CAUTION: To prevent personal injury, the load and support stand(s) MUST be stable before any work begins underneath the load.**

(For the full set of safety precautions and operating instructions, see Appendix A, *infra*.) On the left side of the safety precautions are three pictograms: one shows a person reading instructions; one shows debris bouncing off of a person's protective eyewear; and one shows a load falling on a person.

Also, affixed to the base of each support stand is a decal, which in relevant part provides:

**WARNING**

To prevent personal injury,

… .

- Always use the support pin; insert support pin completely through extension tube.

… .

- … . Load and support stand(s) must be stable before working beneath vehicle.

(For the full decal, see Appendix B, *infra*.) The warning decal also includes three pictograms, and each appears to the left of one of the first three bulleted instructions: the pictogram showing a person reading instructions appears next to the instruction that the user follow all instructions; the pictogram showing debris bouncing off of a person's safety goggles appears next to the instruction to wear eye protection; and the pictogram showing a load falling on top of a person appears next to the instruction not to exceed the capacity rating. No pictograms appear before the remaining four bulleted instructions, including the support-pin instruction, but those instructions are positioned below the pictogram illustrating a load falling on a person.

It is undisputed that Weigle and Moore did *not* use the support pin on the day of the incident. Weigle took care of situating the trailer onto the support stands, and he admitted that he never read the "Parts List and Operating Instructions" or the decal affixed to each support stand. Moore, on the other hand, had previously read all the instructions and warnings, but he did not inspect the support stands to see if the support pins were in place.

### B. Summary Judgment Proceedings

Weigle and Moore sued SPX in state court, asserting claims of inadequate warnings and defective design under the IPLA, and SPX removed both cases to the Southern District of Indiana, *see* 28 U.S.C. §§ 1332, 1441.[2] At the close of discovery,

---

[2] April Weigle and Corinne Moore each joined their respective husband's

(continued...)

SPX filed near-identical motions for summary judgment in both cases. *See* Fed. R. Civ. P. 56.

In opposition to SPX's motions for summary judgment, Weigle and Moore designated evidence that, according to industry custom, it is safest to operate support stands in their lowest possible position. Weigle testified in his deposition that the lowest position is the safest because it minimizes the distance that the mechanics have to lift the heavy tires when removing and reinstalling them. Similarly, Moore testified that he had been taught that support stands must be operated in the lowest possible position to ensure maximum stability. Roger Tapy, the owner and president of Truckers at the time of the incident, also noted that "in standard business, the lowest part of the stand is the safest height."

Weigle and Moore also presented evidence that the SPX support stands are unlike most (if not all) other support stands on the market. Moore testified that other support stands are designed such that the center column cannot touch the ground even when a pin is not used, and for this reason, Moore was under the impression that the pin was merely used to adjust the support stands' height. Tapy also testified that in his 25 years with Truckers, the SPX support stands were the only

---

[2] (...continued)
complaint and asserted derivative claims for loss of consortium. Additionally, Guarantee Insurance Company, Truckers' worker's compensation carrier, intervened to protect its lien under the Indiana Worker's Compensation Act, *see* Ind. Code § 22-3-2-13. Neither the wives' loss-of-consortium claims nor the intervener's interests have any independent bearing on this appeal.

ones in which the center column could touch the ground when the pin was not used; the other approximately 60 stands with which he had experience were designed so that the center column could never touch the ground.

They also designated the report and deposition testimony of William Dickenson, a professional engineer. Dickenson opined that the SPX support stands were defective and unreasonably dangerous because the column is permitted to pass through the plane of the base in the unpinned position. In his view, the support stands do not satisfy the requirements for the design of the central column set forth in Part 4 of the American Society of Mechanical Engineers's Portable Automotive Lifting Device standards ("ASME PALD-4"). As relevant here, the section of ASME PALD-4 in both the 1993 and 2005 standards addressing columns provides: "In the fully retracted position, the lower end of the column shall not extend below the plane made where the base contacts the ground." Dickenson interprets the term "fully retracted position" to refer to the lowest position of the column without use of the pin. He bases this interpretation on the fact that the 1993 and 2005 standards departed from the term "lowest operating position" (i.e., the lowest position with the pin) used in the 1991 standard.

Dickenson opined that utilizing the support stands without the support pin was foreseeable. In his opinion, SPX "could have designed the column of the stand with a stop that prevented the column from retracting into the stand beyond its lowest operating position. This could have been accomplished by simply permanently installing a pin in the hole that establishes the lowest operating position of the vehicle stands."

Dickenson acknowledged the warnings against not using the support pin, but he explained that "[a] warning is not an adequate solution because warnings are not as effective at removing hazards as designing the system so that the hazard would be eliminated. Warnings rely upon human actions, which are often not reliable." He admitted that he had not conducted a statistical or financial analysis respecting his proposed alternative, but he testified that it cost him only about $10 to alter the support stands. He also noted in his report that after reviewing the descriptions of other support stands that are similar to the SPX support stands, the SPX stands appear to be the only ones on the market that fail to satisfy ASME PALD-4. Finally, Dickenson noted that based on all the materials he had reviewed it did not appear that the designers had conducted "any failure modes and effects analysis, any hierarchy of design analysis, [or] any application of safety through design in this product"; in his view, not only did the designers not exercise reasonable care, they exercised no care at all.

Weigle and Moore also designated the deposition of Michael Schoenoff, Manager of Mechanical Engineering at SPX, whom SPX had designated both as an expert witness and as its representative under Federal Rule of Civil Procedure 30(b)(6). In Schoenoff's view, the support stands were not defectively designed and were misused by the plaintiffs. He explained that Dickenson's interpretation of the ASME PALD-4 standard was in error because "fully retracted position" refers to the lowest position of the stand when the pin is used. Schoenoff also testified that SPX was aware in 1985 that the support stand was unstable without the pin. He also agreed

that there is no evidence that SPX considered alternative designs. Nor is there any evidence that SPX conducted a hazard-risk or failure-mode analysis on the support stand.

Lastly, Weigle and Moore designated the deposition of Larry Betcher, Manager of Product Innovation at SPX, who designed the SPX support stand at issue. Like Schoenoff, Betcher disagreed with Dickenson's interpretation of ASME PALD-4 and interpreted "fully retracted position" to refer to the lowest pinned position. Betcher also testified that use of the support stand without the support pin is inherently dangerous because the load is likely to come crashing down. He admitted that it was foreseeable that a user might operate the support stand without the pin, which is why the instruction that the pin should always be used was included. Betcher also testified that no alternative designs had been considered, no field studies had been conducted to determine whether the support stand was being operated without the pin, and the effectiveness of the warnings never had been tested.

The district court granted summary judgment for SPX on all claims. It first concluded that the instructions and warnings were adequate as a matter of law. As to the defective-design claims, the court did not address the sufficiency of Weigle's and Moore's designated evidence. Instead, relying on *Marshall v. Clark Equipment Co.*, 680 N.E.2d 1102, 1106 (Ind. Ct. App. 1997), it concluded that because the warnings were adequate, the support stands were neither defective nor unreasonably dangerous. Weigle and Moore now appeal.

## II. Discussion

We review a district court's grant of summary judgment de novo, *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013), construing all facts and inferences in favor of the nonmovants, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The IPLA "imposes liability upon sellers of a product in a defective condition unreasonably dangerous to any user or consumer." *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 809 (Ind. 2007) (citation omitted); *see* Ind. Code § 34-20-2-1. A plaintiff bringing an action under the IPLA must establish that (1) the product was in a defective condition; (2) the product was unreasonably dangerous; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; (5) the product was expected to and did reach the user or consumer without substantial alteration; and (6) the defect in the product caused the plaintiff's injury. *See* Ind. Code § 34-20-2-1; *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 635–36 (7th Cir. 2006); *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 440–41 (Ind. 1990). In this case there is no dispute that Weigle and Moore were foreseeable users of the support stands, that SPX was in the business of selling the support stands, and that the support stands had not been substantially altered.

A product can be defective because of a manufacturing defect, a design defect, or a lack of adequate instructions and warnings. *See* Ind. Code §§ 34-20-2-1 to -3; *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 281 (Ind. 1983). Inadequate-warning and defective-design claims both sound in negligence. *See* Ind. Code § 34-20-2-2. To prevail on a negligence claim a plaintiff must establish "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." *Rushford*, 868 N.E.2d at 810 (citation omitted).

### A. Inadequate-Warnings Claims

A product is defective under the IPLA "if the seller fails to: (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions to the user or consumer." Ind. Code § 34-20-4-2; *see also Rushford*, 868 N.E.2d at 810 ("This duty is twofold: (1) to provide adequate instructions for safe use and (2) to provide a warning as to dangers inherent in improper use."). A "'product label must make apparent the potential harmful consequences. The warning should be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger.'" *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1162 (Ind. Ct. App. 1988) (citation omitted). A warning's adequacy is measured by its factual content, the manner in which it is expressed, and the method of conveying these facts. *Id.* at 1162–63. The adequacy of a warning (i.e., whether the defendant breached its duty to warn) is generally a question of fact, but it can be decided as a

matter of law when the facts are undisputed and only one inference can be drawn from those facts. *Cook v. Ford Motor Co.*, 913 N.E.2d 311, 327 (Ind. Ct. App. 2009).

SPX argues that the district court's judgment should be affirmed because the warnings and instructions clearly informed users that the support pins are always to be used and that failure to use them can result in personal injury. Alternatively, SPX contends that, even if the warnings are not sufficient as a matter of law, the district court's judgment should still be affirmed because any alleged defect in the warnings could not have been the proximate cause of Weigle's and Moore's injuries because Weigle did not read the warnings and Moore did not inspect the stands to ensure that the pins were in place. We need not reach the issue of proximate cause because we agree with SPX and the district court that the warnings are sufficient as a matter of law, hence Weigle and Moore have failed to establish that SPX breached its duty to warn.

Weigle and Moore acknowledge that the "Parts List and Operating Instructions" and the decal affixed to the stands both provide instructions for safe use ("[a]lways use the support pin; insert support pin completely through extension tube") and warnings about the dangers inherent in improper use ("personal injury" accompanied by a pictogram showing a load falling on top of a person), but they contend that this is not sufficient. According to them, the warnings are inadequate because they do not warn "that the jack stand is unstable when the bottom of the extension column touches the ground when the pin is not inserted," that is, "the warnings' content was deficient because it failed to explain the significance of the

support pin in maintaining the stability of the jack stand."
They reaffirmed their position at oral argument when they
unequivocally stated that the warnings must provide not only
the consequences of not using the pin but also the mechanics
of the pin (e.g., use the pin or the stand will not be stable).

Weigle and Moore cite only *Cook*, 913 N.E.2d 311, in
support of their position. *Cook* arose from a car accident in
which an eight-year-old child, who had not been wearing a
seatbelt, was severely injured when the front passenger-seat
airbag deployed. *Id.* at 315–17. The owner's manual accompa-
nying the vehicle indicated that the airbag (which could be
deactivated) should always be on "unless there is a rear-facing
infant seat installed in the front seat" and that turning off the
passenger airbag "increases the likelihood of injury to forward
facing occupants in the passenger seat." *Id.* at 316, 326. The
plaintiffs had designated expert testimony that airbags pose a
risk to all children in the front passenger seat, not just children
in rear-facing child seats. *Id.* at 326. The Indiana Court of
Appeals reversed the trial court's grant of summary judgment,
explaining that the warnings were not adequate as a matter of
law because, based on the wording of the owner's manual and
the expert testimony, there was "a question of fact as to
whether a reasonable person would have understood from
Ford's instructions that injury could occur under these circum-
stances." *Id.* at 327. One judge dissented on grounds that the
Cooks had failed to comply with Ford's other instructions to
place children in the backseat and to wear seatbelts. *Id.* at
334–35 (Brown, J., concurring in part and dissenting in part).
The majority rejected the dissent's reasoning because "the
language selected by Ford with respect to the additional

warnings was permissive; that is, it equivocally instructed to place children in the backseat 'if possible,' 'suggested' that children are safer there, and that occupants 'should' always wear seat belts." *Id.* at 328 (majority opinion). The warnings also failed to provide "that one of the risks from which children are possibly safer is injury from deployment of the front seat passenger airbag." *Id.* The court concluded that there was a question of fact as to whether Ford's warnings were "strong and specific enough to warn the Cooks that the additional instructions [on placing children in the backseat and wearing seatbelts] were linked to danger from the airbag." *Id.*

Like the district court, we are unable to see how *Cook* supports Weigle's and Moore's argument that SPX's warnings are inadequate because they fail to explain the mechanics of the support pin. Unlike the instructions in *Cook*, the instructions here provide that the support pin "always" must be used by placing it all the way through the column and that the risk of not using the support pin is personal injury; in other words, the warnings here cannot be construed as permissive or equivocal.

Moreover, SPX's instruction that the support pin must always be used is linked to the risk of personal injury and is accompanied by a pictogram illustrating a load falling on top of a person. Weigle and Moore suggest that the placement of the pictogram on the decal affixed to the support stands is confusing because it is placed next to the instruction not to exceed the capacity rating and not next to the instruction regarding the support pin. *See* Appendix B, *infra*. They claim that Betcher testified in his deposition that the pictogram was intended to apply only to the warning that appears immedi-

ately following the picture. We are not persuaded that this raises an issue of triable fact. For one thing, Betcher actually testified that the pictogram applied to the capacity-warning rating and to all subsequent warnings and instructions on the decal. In addition, immediately following the instruction in the "Parts List and Operating Instructions" related to insertion of the support pin is a bolded instruction, preceded by "IMPOR-TANT," that the user should "[a]lways check the placement of the support pin before lowering a load onto a support stand." *See* Appendix A, *infra*. In short, the instructions and warnings convey to a user that failure to use the support pin may result in personal injury caused by the load falling. No additional warnings need to be furnished where such warnings would not supplement the user's understanding of the nature and characteristics of the product. *See Shanks v. A.F.E. Indus., Inc.*, 416 N.E.2d 833, 837 (Ind. 1981); *Birch v. Midwest Garage Door Sys.*, 790 N.E.2d 504, 518 (Ind. Ct. App. 2003).

What Weigle and Moore really desire is a physics lesson to accompany the support stands. We have been unable to find any Indiana authority supporting their view (which invariably would lead to claims that the warnings are too technical and confusing). Indeed, we rejected a similar argument in *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651 (7th Cir. 1998). In *McMahon*, the plaintiff had been badly burned by coffee purchased from a gas station and had sued the manufacturer of the coffee maker under Indiana law, claiming that it had "failed to warn consumers about the severity of burns that hot coffee can produce." *Id.* at 654. The plaintiff argued that the warnings should have indicated that hot coffee can cause third-degree burns. We rejected her argument:

Bunn can't deliver a medical education with each cup of coffee. Any person severely injured by any product could make a claim, at least as plausible as the McMahons', that they did not recognize the risks *ex ante* as clearly as they do after the accident.

Insistence on more detail can make any warning, however elaborate, seem inadequate. Indiana courts have expressed considerable reluctance to require ever-more detail in warnings. See *Meyers v. Furrow Building Materials*, 659 N.E.2d 1147 (Ind. Ct. App. 1996); *Welch v. Scripto-Tokai Corp.*, 651 N.E.2d 810 (Ind. Ct. App. 1995). For good reasons, laid out in *Todd v. Societe BIC, S.A.*, 9 F.3d 1216, 1218–19 (7th Cir. 1993) (en banc) (Illinois law): "Extended warnings present several difficulties, first among them that, the more text must be squeezed onto the product, the smaller the type, and the less likely is the consumer to read or remember any of it. Only pithy and bold warnings can be effective. Long passages in capital letters are next to illegible, and long passages in lower case letters are treated as boilerplate. Plaintiff wants a warning in such detail that a magnifying glass would be necessary to read it. Many consumers cannot follow simple instructions (including pictures) describing how to program their video cassette recorders." Indiana has the same general understanding … .

*McMahon*, 150 F.3d at 656–57 (citation omitted). SPX was not required to explain the physics of the support stands to satisfy its duty to provide adequate instructions and warnings. Rather, it is enough that SPX instructed users on how to use the stand properly ("[a]lways use the support pin") and warned users of the inherent dangers of not following those instructions ("personal injury" with a pictogram of a load falling on a person). We thus agree with the district judge that Weigle and Moore have failed to demonstrate a genuine issue of material fact as to the adequacy of the warnings.

### B. Defective-Design Claims

A second way that a product can be in a defective condition under the IPLA is "if, at the time it is conveyed by the seller to another party, it is in a condition: (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption." Ind. Code § 34-20-4-1. As noted earlier, defective-design claims sound in negligence, so a party alleging a design defect "must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product." Ind. Code § 34-20-2-2; *see TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 209 (Ind. 2010). A plaintiff alleging defective design as a result of negligence must demonstrate that the defendant failed "to take precautions that are less expensive than the net costs of accidents." *McMahon*, 150 F.3d at 657; *see also Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 902 (7th Cir. 1994); *Miller v. Todd*, 551 N.E.2d 1139, 1141, 1143 (Ind. 1990). In other words, to establish that the defendant

was negligent the plaintiff must establish B < PL, where B is the cost of the precaution (i.e., the "burden" of avoiding the accident), P is the probability of the accident that the precaution would have prevented, and L is the loss if there is an accident that the precaution could have prevented. *Bourne*, 452 F.3d at 637; *Mesman v. Crane Pro Servs.*, 409 F.3d 846, 849 (7th Cir. 2005); *Bammerlin*, 30 F.3d at 902; *see also United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.). Consequently, "the fact that the probability of a particular failure is low is no defense if the costs of protecting against it are even lower." *Bammerlin*, 30 F.3d at 902 (citing *Restatement (Third) of Torts: Products Liability* § 2(b) & reporters' notes, at 40–45, 123–25 (Tentative Draft No. 1, 1994)).[2]

---

[2]   In *TRW Vehicle Safety Systems*, the Indiana Supreme Court dropped a somewhat confusing footnote in which it explained that the Indiana Legislature had adopted a negligence standard for defective-design claims, instead of the strict-liability standard articulated in *Restatement (Third) of Torts: Products Liability* § 2(b), at 14 (1998) (hereinafter *Products Liability*). 936 N.E.2d at 209 n.2. The reason this is confusing is that § 2(b) does not articulate a strict-liability standard; it articulates a risk-utility standard, similar to B < PL, by providing that a product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design … and the omission of the alternative design renders the product not reasonably safe." *See also Products Liability*, *supra*, § 2 cmt. a, at 16 (noting that § 2(b) "achieve[s] the same general objectives as liability predicated on negligence"); *id.* § 2 cmt. d reporters' note II-A, at 49 (citing cases and observing that while Indiana statute articulates a reasonable-consumer-expectations test, Indiana courts and federal courts applying Indiana law have required proof of a reasonable alternative design in defective-design cases). Adding further confusion is the fact that the Indiana Supreme Court went on to

(continued...)

In addition to establishing that the product was in a
defective condition due to negligence, a defective-design
plaintiff must establish that the defective condition rendered
the product "unreasonably dangerous." *See* Ind. Code § 34-20-
2-1; *Bourne*, 452 F.3d at 635–36; *McMahon*, 150 F.3d at 651. The
"requirement that the product be in a defective condition
focuses on the product itself while the requirement that the
product be unreasonably dangerous focuses on the reasonable
expectations of the consumer." *Baker v. Heye-America*, 799
N.E.2d 1135, 1140 (Ind. Ct. App. 2003) (citations omitted); *see
also Moss v. Crossman Corp.*, 136 F.3d 1169, 1174 (7th Cir. 1998).
For purposes of the IPLA, "unreasonably dangerous" "refers
to any situation in which the use of a product exposes the user
or consumer to a risk of physical harm to an extent beyond that
contemplated by the ordinary consumer who purchases the
product with the ordinary knowledge about the product's

---

[2] (...continued)

hold that there was sufficient evidence to support the jury's verdict for the
plaintiff because, among other things, there was testimony that the
defendant had been aware of the problem and that an alternative, safer
design was both technologically and economically feasible. *TRW Vehicle
Safety Sys.*, 936 N.E.2d at 210. The parties do not quarrel over the proper
standard to apply to defective-design claims, so we need not attempt to
decipher what the Indiana Supreme Court was attempting to say—i.e.,
whether the court meant to disapprove of the requirement that a defective-
design plaintiff show that the defendant failed to take precautions that are
less expensive than the net costs of accidents, *cf. Bammerlin*, 30 F.3d at 902
("Our court has applied Judge Hand's approach in many kinds of negli-
gence actions, and as the definition of a product defect in Indiana depends
on general principles of negligence, we have no reason to think that state
would see things otherwise." (internal citations omitted)).

characteristics common to the community of consumers." Ind. Code § 34-6-2-146.

A reasonable fact finder could determine from Weigle's and Moore's designated evidence that the SPX support stands at issue were in a defective condition that was unreasonably dangerous. That the SPX support stands differ from most (if not all) others on the market (in allowing the center column to drop all the way to the ground) tends to show that their design is not contemplated by reasonable persons among those considered expected users. Additionally, because the SPX stands are inherently unstable when used without the pin, but other available stands are not (because of built-in safeguards), a fact finder could find that the stands are unreasonably dangerous. The risk that the stands would be used without the pin was concededly foreseeable, and a fact finder could determine that failure to take the minor precaution of building in a safeguard, such as a permanent pin in the lowest operating position or some other type of barrier preventing the extension tube from dropping below that position, demonstrates that SPX failed to exercise reasonable care under the circumstances. A fact finder might also conclude that the lack of any evidence that SPX undertook a hazard-risk or failure-mode analysis on the support stand demonstrates negligence. Finally, a fact finder could find a lack of reasonable care under the circumstances because the support stands fail to comply with ASME PALD-4. To be sure, there is a dispute over the meaning of the standard and whether the support stands satisfy it, but this merely establishes a genuine issue of material fact; unlike the interpretation of an ambiguous state or federal regulation, *see, e.g.*, *Bammerlin*, 30 F.3d at 900, the meaning of an industry

standard is a factual issue to be resolved by the fact finder. In any event, even if we were to accept SPX's interpretation of ASME PALD-4, Weigle and Moore have designated sufficient evidence to withstand summary judgment because compliance with an industry standard does not necessarily defeat a defective-design claim under the IPLA. *See* Ind. Code § 34-20-5-1(1).

The district court never addressed the plaintiffs' designated evidence because, relying on *Marshall v. Clark Equipment Co.*, 680 N.E.2d 1102, 1106 (Ind. Ct. App. 1997), it concluded that the presence of adequate warnings rendered the support stands nondefective and not unreasonably dangerous. This was SPX's primary argument in the district court, but it does not mount much of a defense of the district court's rationale in its brief to this court. At oral argument, however, SPX made clear its belief that a manufacturer is not required to design a safer product in anticipation of users ignoring adequate warnings. Effectively, the position taken by SPX and adopted by the district court is that adequate instructions and warnings amount to a complete defense to a defective-design claim. Weigle and Moore do not dispute that the district court properly applied *Marshall*, but they argue that *Marshall* is inconsistent with current Indiana law.[3] As an alternative

---

[3]   Though they developed their arguments that there are triable issues of fact, it does not appear that Weigle and Moore argued below that *Marshall* is inconsistent with current law. Perhaps this is because they also maintained that the warnings were inadequate, as *Marshall* would not have come into play had the district court been unable to find that the warnings were adequate as a matter of law. We need not decide whether Weigle's and

(continued...)

ground for affirmance, SPX argues that the defense of misuse entitles it to summary judgment on the defective-design claims. *See* Ind. Code § 34-20-6-4. Though presented below, the district court did not address this argument because it had no need to do so. We address each defense in turn.

### 1. Adequate Warnings "Defense"

In *Marshall*, a plaintiff who had been injured while operating a forklift appealed from an adverse judgment on the ground that the trial court had erred in refusing his tendered jury instruction, which in relevant part provided that "[i]f the product can be made reasonably safe by selecting an available alternative design, the manufacturer must do so rather than merely place a warning on the product." *Id.* at 1104 (internal quotation marks omitted). The Indiana Court of Appeals rejected the plaintiff's argument, finding that the tendered instruction had not correctly stated Indiana law. *Id.* at 1104–06. The court explained that "[w]hile warnings cannot make a dangerous product safe, such warnings may avert liability." *Id.* at 1105 (citing *Jarrell*, 528 N.E.2d at 1166). Relying almost exclusively on *Dias v. Daisy-Heddon*, 390 N.E.2d 222, 225 (Ind. Ct. App. 1979), which in turn had relied on Comment j to the *Restatement (Second) of Torts* § 402A (1965), the court held that "a manufacturer may avoid liability by placing adequate warnings on a product even when there is evidence of a 'safer' alternative design." *Marshall*, 680 N.E.2d at 1106.

---

[3] (...continued)

Moore's failure to raise their argument below amounts to waiver because SPX has not claimed on appeal that they waived it.

Contrary to SPX's assertion in its brief, the Indiana Supreme Court has not addressed the issue. In *Rushford*, a duty-to-warn case, the court held that, "absent special circumstances, if the manufacturer provides adequate warnings of the danger of its product and the seller passes this warning along to the buyer or consumer, then the seller has no obligation to provide additional warnings." 868 N.E.2d at 811. It is true that the *Rushford* court found support for its holding in *Dias*, specifically, *Dias*'s quotation of § 402A, Comment j. 868 N.E.2d at 811 (quoting *Dias*, 390 N.E.2d at 225). But the court's citation of *Dias* was not necessary to determining the issue before it—whether a seller has a duty to provide warnings to supplement the warnings provided by the manufacturer where the product has not been altered. And "statements not necessary in the determination of the issues presented are *obiter dictum*. They are not binding and do not become the law." *Koske*, 551 N.E.2d at 443 (citations omitted); *see also Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1176 (7th Cir. 1990) ("No court is required to follow another court's dicta." (citation omitted)).

As this is a diversity case, we are bound to apply Indiana law as we predict it would be applied by the Indiana Supreme Court. *See, e.g., Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). Where, as here, the Indiana Supreme Court has not squarely addressed the issue, we will follow the decisions of the Indiana Court of Appeals unless there are persuasive reasons to believe that the high court would disagree with them. *Gutierrez v. Kermon*, No. 12-2934, 2013 WL 3481359, at *7 n.2 (7th Cir. July 12, 2013); *see Ind. Harbor Belt R.R. Co.*, 916 F.2d

at 1176 ("We are not required to follow even the *holdings* of intermediate state appellate courts if persuaded that they are not reliable predictors of the view the state's highest court would take." (citations omitted)). For several reasons, we are persuaded that the Indiana Supreme Court would not apply *Marshall* to the defective-design claims in this case.

It is helpful to begin with a brief review of the development of products-liability law in Indiana. Prior to the enactment of the IPLA in 1978, the Indiana Supreme Court had adopted the doctrine of strict products liability set forth in § 402A. *Dias*, 390 N.E.2d at 224; *see Ayr-Way Stores, Inc. v. Chitwood*, 300 N.E.2d 335, 339–40 (Ind. 1973). In 1978, the Indiana Legislature codified most aspects of § 402A into the IPLA, but it left claims based on negligence to the common law. *See Miller*, 551 N.E.2d at 1143; *Koske*, 551 N.E.2d at 442–43. The Indiana Supreme Court made this clear in *Koske*, where it held that the "open and obvious danger" rule did not apply to strict liability claims, as it had not been included in the IPLA, but remained applicable to negligence claims because the IPLA had not at that time been extended to negligence. 551 N.E.2d at 442–43. In 1995, the Indiana Legislature amended the IPLA to apply to all products-liability actions, regardless of the substantive legal theory, Ind. Code § 34-20-1-1, and provided that defective-design and inadequate-warnings claims are to be governed by negligence principles rather than strict liability, § 34-20-2-2. *See Bourne*, 452 F.3d at 635. Because the IPLA had codified the entire field of products liability, we held in *Mesman* that the "open and obvious danger" rule no longer applied to defective-design claims because the legislature had omitted that defense. 409 F.3d at 850. Another important feature of the

1995 amendments was the addition of the requirement that liability under the IPLA "be determined in accordance with the principles of comparative fault." *Green v. Ford Motor Co.*, 942 N.E.2d 791, 794 (Ind. 2011).

Notably absent from the current statute is a defense or presumption that adequate warnings render a product not defective and not unreasonably dangerous. The statute provides only three defenses: incurred risk, misuse (not reasonably foreseeable), and modification. Ind. Code §§ 34-20-6-3 to -5. These are the only defenses available in an action under the IPLA. *See McGraw-Edison v. Ne. Rural Electric Membership Corp.*, 678 N.E.2d 1120, 1123–25 (Ind. 1997) (holding that disclaimer in purchase agreement purportedly limiting seller's liability was no defense to action under IPLA); *see also Mesman*, 409 F.3d at 850. The statute does supply a rebuttable presumption that a product is not defective if it either "was in conformity with the generally recognized state of the art applicable to the safety of the product" or "complied with applicable codes, standards, regulations, or specifications established, adopted, promulgated, or approved" by a federal or Indiana governmental body or agency. Ind. Code § 34-20-5-1. This presumption is not applicable here, and there are no other presumptions delineated in the IPLA.

To be sure, the statute provides that a product is in a defective condition if not accompanied by adequate instructions and warnings, so if a product bears adequate instructions and warnings it is not in a defective condition under § 34-20-4-2. But the statute also provides an alternative basis for finding a product in a defective condition, § 34-20-4-1, and that section determines whether a product has a design defect or a manu-

facturing defect. Nothing in the IPLA indicates that the lack of a defect under § 34-20-4-2 precludes a finding of a defect under § 34-20-4-1. It is true that "[a] product is not defective … if it is safe for reasonably expectable handling and consumption. If an injury results from handling, preparation for use, or consumption that is not reasonably expectable, the seller is not liable under this article." § 34-20-4-3. But in this case, Weigle and Moore have come forth with evidence that it was reasonably expectable that the support stands would be used sans support pin and that using the stands in that manner was not safe. They have also designated evidence that the support stands are not incapable of being made safe. *Cf.* § 34-20-4-4.

Moreover, SPX's view that a manufacturer should not have to design safer products if it provides adequate warnings is inconsistent with the standard of care for product design set forth in § 34-20-2-2. A product designer must exercise reasonable care under the circumstances, and it is unreasonable to omit from a product an easily installed and inexpensive safeguard that would prevent potentially fatal accidents and rely simply on the users' ability and willingness to read, comprehend, and follow all instructions and warnings on all occasions. *See Koske*, 551 N.E.2d at 441 (criticizing "open and obvious" rule as obscuring or minimizing "consideration of human factors related to the foreseeable circumstances of expected product use" (citations omitted)); *see also Mesman*, 409 F.3d at 849–52. The American Law Institute has explained:

> *In general, when a safer design can reasonably be*
> *implemented and risks can reasonably be designed out*
> *of a product, adoption of the safer design is required*
> *over a warning that leaves a significant residuum of*

> *such risks.* For example, instructions and warnings may be ineffective because users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings. However, when an alternative design to avoid risks cannot reasonably be implemented, adequate instructions and warnings will normally be sufficient to render the product reasonably safe. *Warnings are not, however, a substitute for the provision of a reasonably safe design.*

*Restatement (Third) of Torts: Products Liability* § 2 cmt. *l* (1998) (emphases added) (hereinafter *Products Liability*). The Reporter's Note to Comment *l* explains that the contrary rule—applied in *Marshall*—is based on the "unfortunate language" of § 402A Comment j, and notes that Comment j "has elicited heavy criticism from a host of commentators." *Id.* § 2 cmt. *l* reporters' note, at 101; *see* Howard Latin, *Good Warnings, Bad Products, and Cognitive Limitations*, 41 U.C.L.A. L. Rev. 1193, 1206–07 (1994); A.D. Twerski et al., *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age*, 61 Cornell L. Rev. 495, 506 (1976). The Reporter's Note goes on to explain that "Comment *j* of the Restatement, Second, is inconsistent with the judicial abandonment of the patent danger rule." *Products Liability*, *supra*, § 2 cmt. *l* reporters' note, at 101; *cf. Mesman*, 409 F.3d at 850 (explaining that Indiana has abandoned the patent-danger rule).

This is not to say that the provision of adequate instructions and warnings is irrelevant to a defective-design claim. The IPLA expressly requires that liability be determined under principles of comparative fault. Ind. Code § 34-20-8-1; *Green*, 942 N.E.2d at 794. Indiana law allows a fact finder to consider a wide variety of factors in the allocation of fault. *Green*, 942 N.E.2d at 794–95. A defendant in a defective-design case can argue to the fact finder that the plaintiff's failure to read and heed adequate warnings and instructions was itself negligent and that fault should be allocated accordingly. If the fact finder allocates more than 50% of the total fault to the plaintiff, then the defendant will avoid liability. Ind. Code §§ 34-51-2-7 & -20-8-1.

In sum, we predict that the Indiana Supreme Court would not apply *Marshall*'s holding to bar Weigle's and Moore's defective-design claims. The current version of the IPLA furnishes no basis for SPX's adequate-warnings defense, and that defense is inconsistent with the standard of care required of product designers. At most, a plaintiff's failure to read and heed adequate instructions and warnings is something for the fact finder to consider in allocating fault.

### 2. Misuse

The IPLA recognizes a defense "that a cause of the physical harm is a *misuse* of the product by the claimant or any other person *not reasonably expected* by the seller at the time the seller sold or otherwise conveyed the product to another party." Ind. Code § 34-20-6-4 (emphases added); *see, e.g.*, *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1341–44 (7th Cir. 1995). "Foreseeable use and misuse are typically questions of fact for a jury to

decide." *Barnard v. Saturn Corp.*, 790 N.E.2d 1023, 1028 (Ind. Ct. App. 2003). Misuse is not a complete defense but is considered an aspect of comparative fault. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 689 (7th Cir. 2002); *cf. Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1148 n.3 (Ind. 2003) (declining to decide whether misuse is a complete defense).

SPX relies on *Barnard* in arguing that it is entitled to summary judgment. In that case, contrary to the instructions and warnings, the decedent had used a jack that was intended to be used only to change tires to prop up his car for an oil change on an uneven surface, and while he was working the car fell on top of him. 790 N.E.2d at 1031. The court found that no reasonable jury could find the decedent to have been less than 50% at fault. *Id.*

Despite the similarities between *Barnard* and the present case, we conclude that SPX is not entitled to summary judgment on the defense of misuse. Weigle and Moore have designated evidence from which a fact finder could determine that use of the support stands without the pin was reasonably foreseeable. Betcher admitted as much, which is why the instructions and warnings stressed that the pin must always be used.[4] Moreover, the allocation of fault is classically a determination for the fact finder. *Green*, 942 N.E.2d at 795.

---

[4] In a footnote the *Barnard* court suggested that the term "reasonably expected use" actually means "reasonably expected permitted use" because otherwise the inclusion of a specific warning would amount to an admission that a use contrary to that warning was foreseeable. 790 N.E.2d at 1031 n.3.

(continued…)

### III. Conclusion

For the foregoing reasons, the district court's judgments are AFFIRMED in part, VACATED in part, and the causes are RE-MANDED for further proceedings consistent with this opinion.

---

[4] (…continued)

We do not think the Indiana Supreme Court would so brazenly insert additional words into a statute. *See State v. Am. Family Voices, Inc.*, 898 N.E.2d 293, 297 (Ind. 2008) ("The plain meaning of the statute … must be given effect."); *Grody v. State*, 278 N.E.2d 280, 285 (Ind. 1972) ("It is not within the province of this Court to expand or contract the meaning of a statute by reading into it language which will, in the opinion of the Court, correct any supposed omissions or defects therein." (citation omitted)).

**Appendix A**

## Safety Precautions







CAUTION: To prevent personal injury,

- Read, understand, and follow operating instructions and safety precautions included with this equipment.
- Wear eye protection that meets the requirements of ANSI Z87.1 and OSHA.
- Do not exceed the capacity rating shown on each support stand.
- Inspect the support stand for damage before each use.
- Place the support stand on a smooth, level surface. Soft or irregular surfaces may not provide adequate support, and the stand may tip.
- Always use the support pin, which must be completely inserted through the support stand extension tube.
- Support the load with the center of the support stand pad; do not support a load on the round bars on the ends of the support stand pad.
- The load and support stand(s) must be stable before beginning any repairs underneath the load.

## Operating Instructions
### *(Item numbers refer to the parts list.)*

1. Plan the location of the support stand(s) on a smooth, hard, and level surface to keep the load balanced.

2. Raise the support stand extension tube (Item No. 5) up to the load.

3. Position the support stand under the load so the weight is exerted on the center of the support stand pad.

4. Insert the support pin (No. 1) completely through both walls of the extension tube.

IMPORTANT: Always check the placement of the support pin before lowering a load onto a support stand.

5. If the load is a vehicle, block the wheels to prevent movement.

 CAUTION: To prevent personal injury, the load and support stand(s) MUST be stable before any work begins underneath the load.

**Appendix B**

