**Henry K. BAKER and Phyllis J. Baker, Appellants–Plaintiffs,**

**v.**

**HEYE–AMERICA, Appellee–Defendant,**

**Emhart Glass Manufacturing, Inc., Defendant.**

No. 27A02–0306–CV–523.

Court of Appeals of Indiana.

Dec. 9, 2003.

Transfer Denied March 19, 2004.

Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans, P.C., Kokomo, IN, Attorneys for Appellants.

Michael Ryan Hartman, Karl L. Mulvaney, Hamish S. Cohen, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Henry K. and Phyllis J. Baker appeal the trial court's grant of Heye–America's motion for summary judgment in their product liability suit, contending that genuine issues of material fact remain with regard to whether Heye–America's glass bottle manufacturing machine contained manufacturing or design defects that caused Henry Baker's injuries.

We reverse.

### FACTS AND PROCEDURAL HISTORY

For more than thirty years, Henry Baker worked at a glass bottle manufacturing facility operated by Ball Foster (now known as Saint–Gobain Containers, Inc.). On November 24, 1998, Baker was work-

ing on Machine 51, a glass bottle manufacturing machine that was built by Heye–America according to Ball Foster's specifications. Machine 51 was an eight-section machine that could be operated to make either two or three bottles at a time. It formed bottles when molten glass gobs were fed into it. The machine then formed these gobs into bottles by closing around them, then opening again.[1] To cool the glass, wind was funneled into the machine from a fan beneath the factory floor through one of several types of wind appliances, including configurations known as stacked wind and tube wind.

On the day of the accident, Machine 51 was utilizing stacked wind to cool the bottles. Baker realized that some of the bottles that Machine 51 was producing were of uneven thickness. He knew that this defect may be caused by problems with the amount of wind blowing into the machine to cool the bottles. As Baker was using his hand to test the wind velocity on the blank (output) side of the machine, the mold suddenly opened, pinning his hand between the mold and the stacked wind appliance. He was trapped for eight minutes and received serious burns to his hand before he was freed by his co-workers.

On August 7, 2000, the Bakers filed a complaint against Heye–America, the machine manufacturer, and Emhart Glass Manufacturing, Inc. ("Emhart"), the manufacturer of the machine's control components. They subsequently amended that complaint three times, but the complaint essentially stated a cause of action against both defendants on behalf of Henry Baker for product liability and on behalf of Phyllis Baker for loss of consortium.

Both defendants moved for summary judgment. After all parties submitted briefs and the trial court conducted a hearing on the issue, the trial court granted summary judgment in favor of the defendants. The Bakers now appeal the decision as to Heye–America only.

## DISCUSSION AND DECISION

The Bakers allege that the trial court erred in granting summary judgment in favor of Heye–America on their claim. In reviewing the grant of a motion for summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Wilson v. Lincoln Fed. Sav. Bank*, 790 N.E.2d 1042, 1046 (Ind.Ct.App.2003); *Ross v. Indiana State Bd. of Nursing*, 790 N.E.2d 110, 115–16 (Ind.Ct.App.2003). We do not weigh evidence, but will liberally construe the facts in the light most favorable to the nonmoving party. *Wilson*, 790 N.E.2d at 1046; *Ross*, 790 N.E.2d at 115–16. Summary judgment should be granted only when the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Poznanski ex rel. Poznanski v. Horvath*, 788 N.E.2d 1255, 1258 (Ind.2003); *Reeder v. Harper*, 788 N.E.2d 1236, 1240 (Ind.2003); Ind. Trial Rule 56(C). Accordingly, on appeal, we must determine whether there is a genuine issue of material fact and

1. Throughout the evidence, the witnesses appear to refer to these moving parts, which form the bottles, as both "molds" and "blanks." However, a dictionary of terms used in glass making defines "blank" as "[a]ny cooled glass object that requires further forming or decoration to be finished." http://www.glassonline.com/dictio-nary/429.html. Nonetheless, we will follow the convention of the witnesses and refer to this part of Machine 51 as either "the mold" or "the blank." Regardless of the terminology, it appears that Baker's hand became trapped on the "back" or "output" side of the machine between this moving part and the stationary wind appliance in use at the time.

whether the trial court has correctly applied the law. *Wilson,* 790 N.E.2d at 1046. The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was improper. *Id.; Ross,* 790 N.E.2d at 115–16.

■ Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Ross,* 790 N.E.2d at 115–16. If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. *Id.* A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Poznanski,* 788 N.E.2d at 1258; *Ross,* 790 N.E.2d at 115–16. To be considered genuine for summary judgment purposes, a material issue of fact must be established by sufficient evidence in support of the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial. *Street v. Shoe Carnival, Inc.,* 660 N.E.2d 1054, 1056–57 (Ind.Ct.App.1996).

■ A fact is material when its existence facilitates resolution of any of the issues involved. *Rose & Walker v. Swaffar,* 721 N.E.2d 899, 901 (Ind.Ct.App.2000), *trans. denied.* Notwithstanding a conflict in the facts on some elements of a claim, summary judgment is appropriate when there is no dispute with regard to facts that are dispositive of the litigation. *Id.* However, even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Ross,* 790 N.E.2d at 115–16.

■ This court may not search the entire record but may only consider the evidence that has been specifically designated. *Goodrich v. Indiana Michigan Power Co.,* 783 N.E.2d 793, 795 (Ind.Ct. App.2003), *trans. denied.* All pleadings, affidavits, and testimony are construed liberally and in the light most favorable to the nonmoving party. *Id.; May v. Frauhiger,* 716 N.E.2d 591, 594 (Ind.Ct.App. 1999).

■ When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Indiana Michigan Power Co. v. Runge,* 717 N.E.2d 216, 226 (Ind. Ct.App.1999).

■ The Indiana Product Liability Act ("IPLA") states in part:

"Except as provided in section 3 of this chapter, a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:

(1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;

(2) the seller is engaged in the business of selling the product; and

(3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person

sought to be held liable under this article."

IC 34–20–2–1. A product may be defective within the meaning of the IPLA because of a manufacturing flaw, a defective design, or a failure to warn of dangers in the product's use. *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind.Ct.App.1997), *trans. denied* (1998). In the Bakers' reply brief, they specifically disavow their intent to raise a "failure to warn" product liability claim: "The Bakers do not allege that Heye–America failed to satisfy its duty to warn the users of machine 51 about its operation.... Baker[ ]s['] claim does not revolve around any duty to warn." *Appellants' Reply Brief* at 14. Thus, we consider only whether the designated materials raise an issue of fact with regard to design or manufacturing defects.

IC 34–20–4–1 explains that a product is defective if, at the time it is conveyed by the seller to another party, it is in a condition: (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption. *See also Vaughn v. Daniels Co. (West Virginia), Inc.*, 777 N.E.2d 1110, 1128 (Ind.Ct.App.2002), *decision clar'd on reh'g* 782 N.E.2d 1062 (Ind.Ct.App.2003) (stating statutory definition).

Accordingly, under the IPLA, the plaintiff must prove that the product was in a defective condition that rendered it unreasonably dangerous. *Cole v. Lantis Corp.*, 714 N.E.2d 194, 198 (Ind.Ct.App. 1999); *Welch v. Scripto–Tokai Corp.*, 651 N.E.2d 810, 814 (Ind.Ct.App.1995). This requirement that the product be in a defective condition focuses on the product itself while the requirement that the product be unreasonably dangerous focuses on the reasonable expectations of the consumer. *Cole*, 714 N.E.2d at 198–99; *Welch*, 651 N.E.2d at 814. Unreasonably dangerous has been defined as dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics. *Vaughn*, 777 N.E.2d at 1128 (citing IC 34–6–2–146); *Cole*, 714 N.E.2d at 199; *Rupert v. Mach. Tool Corp.*, 661 N.E.2d 826, 827 (Ind.Ct.App.1995). Further, to be unreasonably dangerous, a defective condition must be hidden or concealed. *Cole*, 714 N.E.2d at 199. A product may be dangerous in the ordinary sense but not "unreasonably dangerous" for product liability purposes under the IPLA. *Welch*, 651 N.E.2d at 814.

The question whether a product is unreasonably dangerous is usually a question of fact that must be resolved by the jury. *Vaughn*, 777 N.E.2d at 1128. Moreover, reasonably expectable use, like reasonable care, involves questions concerning the ordinary prudent person, or in the case of products liability, the ordinary prudent consumer. *Id.* The manner of use required to establish "reasonably expectable use" under the circumstances of each case is a matter peculiarly within the province of the jury. *Id.*

### I. Applicability of the IPLA

As a threshold issue, Heye–America argues that its assembly of Machine 51 did not create a product for purposes of the IPLA. The IPLA does not apply to transactions that involve wholly or predominantly the sale of a service rather than a product. *Lenhardt Tool & Die Co., Inc. v. Lumpe*, 703 N.E.2d 1079, 1085 (Ind.Ct.App.1998), *trans. denied* (2000) (citing IC 33–1–1.5–2(6)). However, distinguishing between a service and a product is sometimes difficult. *Id.* The

repair or refurbishing of a product constitutes a service, while the reconditioning or reconstruction of a product creates a new product. *Id.*

In *Lenhardt*, the defendant argued that it provided a service, not a product, and therefore was not subject to the IPLA. In that case, the defendant's customer would sometimes ship solid blocks of metal to the defendant with drawings and specifications. The defendant would then machine the blocks of metal into molds by following the designs found in the specifications. We observed that through this process, the defendant transformed the metal blocks into new products that were substantially different from the raw material used. Accordingly, we concluded that in such cases the defendant had introduced new products into the stream of commerce and provided products, not services, to its customer. At other times, however, the customer would ship damaged molds to the defendant to be restored to the original designs found in the drawings and specifications. We held that under these circumstances, the repair of a damaged mold could be either the creation of a new product or the service of repairing the original product, depending on the amount of work needed. Ultimately, we held that there was a genuine issue of material fact as to whether the alleged defective product had been created or serviced by the defendant. *Id.* at 1085–86.

▪ Similarly, here, while the designated evidence shows that Machine 51 was "rebuilt" partially from refurbished parts, these parts may have come from a number of old machines that were torn down at an earlier time. Other evidence shows that Heye–America built Machine 51 for Ball Foster. Ball Foster specified the machine through an interactive process with Heye–America, which employs an engineer, but no design professionals.

Robert Hall, director of machine development for Saint–Gobain (formerly Ball Foster), testified that the section of Machine 51 involved in Baker's accident was created and constructed by Heye–America. Dave Gehres, vice-president and general manager of Heye–America, explained that Heye–America builds glass bottle manufacturing machines customized to the specifications of the customer. He also stated that the person in charge of the assembly shop at Heye–America would have been responsible for refining the specifications for Machine 51 when it was rebuilt and assembled. All told, the machine probably contained around 30,000 parts.

Accordingly, while Heye–America "rebuilt" Machine 51, the process was a substantial and complicated one that resulted in a complex new machine that was significantly different from its parts. The designated evidence shows that Heye–America did more than simply provide the service of restoring Machine 51 from a damaged condition. Rather, through an interactive process with Ball Foster, Heye–America designed and produced a custom product that it placed in the stream of commerce. Accordingly, Machine 51 does fall within the ambit of the IPLA. *See also R.R. Donnelley & Sons Co. v. North Texas Steel Co., Inc.,* 752 N.E.2d 112, 122 (Ind.Ct.App. 2001), *trans. denied* (2002) (using *Lenhardt* analysis, defendant was manufacturer under IPLA where it transformed raw material into a new product that was substantially different from the raw material used).

## II. Defects

The Bakers contend that Machine 51 was defective in five ways. First, they contend that, as manufactured, the maintenance stop button was placed so that it "permitted the operator to accidentally trip [it]." *Appellants' Reply Brief* at 5.

Second, they maintain that Machine 51 was defective because the maintenance stop button was manufactured without a guard. Next, they argue that Machine 51 was defective because once a person became trapped in Machine 51 when the blank was open, there was no practical way to release oneself. Fourth, they contend that Machine 51 was defective because it lacked a gauge for determining wind velocity and was designed so that operators were required to test the wind speed with their hands. Finally, they argue that the placement of the basic wind configuration installed on Machine 51 was defective.

### A. Placement of and lack of effective guard on maintenance stop button

The Bakers allege that Machine 51 was defective in that the maintenance stop button was located where it could be inadvertently activated by a worker's knee. Initially, we note that the designated evidence shows some disagreement about whether the maintenance stop button even played a role in Baker's accident. Daniel Smith, Baker's supervisor, testified by affidavit that Baker's hand was caught between the machine's blank and the wind device. When trying to free Baker, he realized that the maintenance stop button had been activated. He released the maintenance stop button and activated the two start buttons, causing the machine to cycle. This caused the blank to close and release Baker's hand. He deduced that the maintenance stop button had been activated because each section of the machine has its own maintenance stop button, and during Baker's accident, the other sections of the machine continued to operate. He explained that by contrast, in the event of a computer failure, the entire machine, not just one section, would have shut down. He further offered that if the machine had broken, it would not have been possible for

him to restart the machine. Gehres agreed that activation of the maintenance stop button would cause the machine's blanks to open, and Hall testified that Machine 51 would open if it shut off for any reason.

However, Henry Baker testified that he was certain that he did not activate the maintenance stop button. In fact, he explained that he would have had to move his leg over to push the maintenance stop button from where he was positioned when the accident occurred. He explained that he could have reached the button from where he was positioned, but he did not touch it. Moreover, he stated that he was properly positioned, but the blanks opened prematurely, which he believed could only have happened if Machine 51 suffered an electrical malfunction. Contrary to Smith's account, he also testified that the machine shut down while he was trapped and that his coworkers had trouble getting Machine 51 restarted after the accident.

Kenny Ayala, tank supervisor for Saint–Gobain, testified that he had experienced problems with two or four sections of Machine 51 shutting down at a time, causing the blanks to stop in the open position. He explained that bad computer cards were the source of this problem, and when workers replaced the cards, the problem was fixed. Contrary to Baker's theory, he opined that an electrical problem, such as that which occurred in the past with Machine 51, would have caused the whole machine to shut down.

James McCann, an engineer and expert witness, testified that in the accident, the machine opened and did not reclose during the next cycle, which is consistent with the machine opening for some other reason than the end of the cycle. He offered that possible causes of the machine opening prematurely and staying open include acti-

vation of the maintenance stop button, power failure, a computer control failure, or a mechanical failure in a hose or valve line or a valve assembly preventing the pneumatics to reclose the machine. In his opinion, the probable cause in this case was the inadvertent activation of the maintenance stop button by Baker, which he believed is supported by the fact that Baker's coworkers were able to restart the machine without repairing any of the pneumatic lines.

Thus, there is a genuine issue of fact with regard to whether Baker even activated the maintenance stop button, and if so, whether its placement or its lack of a guard rendered Machine 51 unreasonably dangerous. Furthermore, the designated materials demonstrate other issues of material fact.

Gehres testified that the maintenance stop button is supplied as requested by the customer and that Ball Foster specified the location of the maintenance stop button. He explained that the maintenance stop button could be placed in other places.

By contrast, Hall, who developed the specifications for the machines Ball Foster needed, testified that Heye–America provided and decided the placement of the maintenance stop button and that he did not decide where the button would be located. Further, he stated that he did not know if it would be feasible to locate the button higher up on the machine. Rather, he left it to Heye–America to design the machine from his basic instructions.

The evidence regarding the guard was similar. Daniel Smith, Baker's supervisor, testified that Ball Foster placed the guard on the maintenance stop button, but it had become loose and was hanging, exposing the top part of the button to inadvertent activation. Baker agreed that Machine 51 had a safety guard on the button at some point, but it had become dislodged and was not over the button.

Gehres and Hall also testified that the maintenance stop button was not covered by a guard or other device to prevent inadvertent activation, but there were guards available for the buttons. However, Gehres explained that the emergency button is supplied by Heye–America as requested by the customer, while Hall testified that Heye–America provided the maintenance stop button, and he left it to Heye–America to design the machine from his basic instructions. Hall testified that Heye–America decided not to put a guard on the maintenance stop button and that Ball Foster never directed Heye–America one way or the other on the issue. Hall also explained that there are advantages to both having a guard and opting not to have one, because a guard might make the button less accessible when it needed to be activated in an emergency.

McCann testified that in his opinion, the machine was defective when delivered to Ball Foster because of the lack of a cover or guard on the maintenance stop button.

In summary, the evidence shows that the maintenance stop button could have been located in a different place on Machine 51. However, it also demonstrates significant disagreement among the witnesses with regard to whether Ball Foster or Heye–America determined the location of the button and whether it would have a guard. The witnesses also provided contradictory evidence about whether the lack of a guard rendered the machine unreasonably dangerous, that is, dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community about the characteristics of glass bottle manufacturing machines. These genuine issues of material fact pre-

clude summary judgment on these theories.

### B. Lack of release mechanism

The Bakers further contend that Machine 51 was defective because it did not have a device that would enable one trapped in Henry Baker's position (between the blank and the stacked wind appliance) to free oneself. Indeed, the uncontroverted evidence establishes that no release mechanism existed. Gehres testified that Baker got his hand trapped between the blank and the cooling device. He explained that activation of the maintenance stop button caused the machine to open, and there is no button that would cause the machine to close.

Baker testified that, after he became trapped, he was unable to restart the machine because it had a two button start mechanism and no release mechanism inside the machine. He also testified that Machine 51 required the operator to work within the moving components of the machine to make adjustments during the machine's operation.

McCann testified that in his opinion, the machine was defective when delivered to Saint–Gobain because of the lack of a mechanism to release an individual trapped between the blank and the machine. However, Gehres testified that Baker's accident, in which his right hand was trapped on the left side of the machine was a "very peculiar accident," *Appellants' Appendix* at 67, that would not have been anticipated. Rather, he opined that the more common safety concern would be providing a mechanism for freeing a worker's hand that was trapped in the closed, not the open, mold. Therefore, genuine issues of material fact also remain as to whether the lack of a release mechanism rendered Machine 51 unreasonably dangerous.

### C. Lack of wind gauge and creation of pinch point

Finally, the Bakers argue that Machine 51 was defective because it did not include a gauge by which an operator could obtain wind measurements and adjust settings "in a way that did not require the operator to place his hand into the moving machinery components." *Appellants' Brief* at 43. In a related argument, they contend that Machine 51 was defective because "it permitted a pinch point to be created between the machine and the blank when the blank was in open position." *Appellants' Brief* at 45.

The evidence shows that Machine 51 could be operated with a variety of wind devices that were changed as necessary to produce different glass containers. In the case of Machine 51, it is unclear whether it was initially installed with any type of wind device. Ordinarily, Ball Foster designed the wind device. Hall explained that Heye–America would put the initial, basic wind device on the machine. However, if Ball Foster did not order a wind supply base, Heye–America would put a plate across the opening to keep dirt out.

Henry Baker, by affidavit, stated that Machine 51 had a stacked wind appliance at the time of the accident. He explained that to adjust the velocity of the wind injected onto the blank, the operator had to place his or her hand into the machine to measure the force of the wind. However, the blank and the hanger were installed such that when they were in the open position, they were so close to the stacked wind appliance that they created an unguarded pinch point.

Nonetheless, Gehres testified that Heye–America does not build machines that require the operator to stick his or her hand inside. Rather, he explained that Heye–America's machines use a magnahelic gauge that measures air pressure,

but there is no way to attach a permanent magnahelic gauge to a machine. Ayala testified that historically, operators would check the wind speed with their hands. Under current practice, however, operators are expected to use a magnahelic gauge, not their hands. He also testified that a portable magnahelic gauge was available to check the wind on Machine 51. However, Baker normally worked on Machine 42, which because of its size was checked by hand rather than gauge, and was only working temporarily on Machine 51 at the time of his accident. Hall seconded that operators were supposed to check the wind with a gauge, not their hands. Nonetheless, he admitted that he too had seen operators check the wind with their hands.

Other evidence demonstrates that checking wind velocity by hand was a common, if not endorsed, practice at Ball Foster. Smith testified that it was customary to check the wind with one's hand and that "everybody" did this. *Appellants' Appendix* at 154. Dennis Timmons, Baker's co-worker, testified by affidavit that the only way to check the wind on Machine 51 was to use one's hand and that another person had previously gotten his hand caught in Machine 51. He also verified that there was no wind gauge on Machine 51 that would permit a visual assessment of the amount of wind. Henry Baker testified that he used a magnahelic gauge to check the wind on the front side of Machine 51, but he was never trained on how to use a gauge to check the wind on the output side of the machine. Jim Crockham and John W. Singer, Baker's co-workers, Baker, and Smith all testified that the only way to check the wind on the blank side of Machine 51 was to use one's hand and that a magnahelic gauge would not have worked under the circumstances. Crockham added that all operators check the wind with their hands, and Singer stated that he knew others that had their hands caught in the past and were released without injury.

However, contrary to this testimony, McCann testified that a magnahelic gauge could have been used to check the wind under the circumstances and that checking the wind with one's hand is dangerous.

The evidence also shows that Heye–America reasonably should have known a great deal about Saint Gobain's manufacturing operations. The two companies were closely linked: Heye–America is wholly owned by Saint–Gobain and its partner in a joint venture. Further, Heye–America's only business is building glass bottle manufacturing machines, and the machines it assembles for Saint–Gobain account for ninety to ninety-five percent of Heye–America's business. Moreover, the assembly and the testing of the machines required Heye–America personnel to visit the Saint–Gobain manufacturing facility.

In summary, the designated summary judgment evidence shows a genuine issue of fact with regard to whether a magnahelic gauge could have been used to measure the wind flow in the problem area of Machine 51 and whether Heye–America knew or reasonably should have known that machine operators customarily placed their hands inside the machine to gauge the wind. These questions preclude summary judgment on this issue as well.

Reversed and remanded for proceedings consistent with this opinion.

BAILEY, J., and VAIDIK, J., concur.