

FILED

Mar 27 2018, 8:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John P. Daly, Jr.
Jared Harts
Golitko & Daly, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jeffrey J. Mortier
Maggie L. Smith
Blake N. Shelby
Frost Brown Todd, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Angela Brewer, Individually and as Personal Representative of the Estate of Rickey A. Brewer, Deceased,

*Appellants,*

v.

PACCAR, Inc. d/b/a PETERBILT MOTORS CO.,

*Appellee.*

March 27, 2018

Court of Appeals Case No. 55A05-1709-CT-2168

Appeal from the Morgan Circuit Court

The Honorable Matthew G. Hanson, Judge

Trial Court Cause No. 55C01-1605-CT-691

**Barnes, Judge.**

# Case Summary

Angela Brewer, individually and as personal representative of the Estate of Rickey Brewer, appeals the grant of summary judgment in favor of PACCAR, Inc., d/b/a Peterbilt Motors Company ("PACCAR"). She also appeals the denial of her motion for partial summary judgment. We reverse and remand.

# Issue

The primary issue before us is whether, as a matter of law, PACCAR cannot be held liable for providing parts of a semi-tractor that lacked allegedly necessary safety features, where the semi-tractor ultimately was assembled by another company and the semi-tractor caused Rickey's death.

# Facts

W&W Transport ("W&W") is an Ohio-based trucking company that owns and operates a number of semi-tractors and trailers. Rather than purchase whole, newly-constructed semi-tractors, W&W often elects instead to assemble its own vehicles. It does so by combining pre-existing engines, transmissions, and exhaust systems with a "glider kit" manufactured by PACCAR. A glider kit generally consists of a semi-tractor cab and chassis but no powertrain. PACCAR also constructs entirely new semi-tractors, complete with engines and transmissions.

In February 2015, W&W ordered a Peterbilt (PACCAR) glider kit from a Peterbilt dealer in Ohio, using specifications similar to other glider kits W&W had purchased in the past. PACCAR then constructed the glider kit according

to those specifications. This glider kit consisted of a cab, chassis, wiring, drive axles, suspension system, and partial braking and steering systems. The cab did not have a rear window; W&W could have requested PACCAR include such a window as an optional feature but it was not a standard feature. W&W subsequently added a "headache rack" to the rear of the cab, which is a bulkhead intended to prevent any cargo behind the cab from crashing into the cab in the event of an accident. PACCAR contends this "headache rack" would have obscured a rear window in the cab if one had been installed. The glider kit also did not come with a backup alarm; again, W&W could have ordered such an alarm as an optional feature, but it was not standard on PACCAR glider kits. W&W did request that the glider kit have wiring to install a beacon/strobe light, but it ultimately did not install such a light when it assembled the semi-tractor. PACCAR did not offer rearview cameras as either a standard or optional feature on its glider kits. Such cameras could have been installed after-market if a customer ordered a "SmartNav" dash screen display from PACCAR, but the "SmartNav" system was not compatible with the older engine W&W intended to use with the glider kit that it ordered. The glider kit also did not come with any warning labels regarding the danger of backing up the semi-tractor.

[5] When PACCAR delivered the glider kit to W&W, it also sent a standard "Information Letter," explaining that the glider kit was not a complete motor vehicle and that whoever added a powertrain to the glider kit was "responsible for understanding and ensuring the completed vehicle is in compliance with

regulations regarding certification, VIN assignment, and registration before placing the vehicle in service." App. Vol. II p. 168. The letter also stated that the glider kit was in conformance with certain federal motor vehicle safety standards, including those governing rearview mirrors. It also stated that the glider kit was not in conformance with certain other safety standards and that the final vehicle assembler was responsible for ensuring compliance with those standards. None of the mentioned standards appear to govern the safety of backing up a semi-tractor without a trailer attached.

[6] W&W combined the glider kit with an engine, transmission, and exhaust system. The engine and transmission had been salvaged from an older semi-tractor. W&W then obtained a certificate of title for the semi-tractor from the Ohio State Highway Patrol so it could be placed into operation.

[7] On March 2, 2016, Rickey was working for his employer, Chicago Bridge & Iron, as a construction foreman at an Indianapolis Power & Light ("IPL") plant that was under construction in Martinsville. W&W employee Raymond Miller was onsite making a delivery, operating the semi-tractor W&W had constructed using the PACCAR glider kit. Rickey was standing behind the semi-tractor, which did not have a trailer attached at the time, when Miller began to back up. Miller did not see Rickey, and Rickey was pinned between the semi-tractor and a detached trailer, killing him. Miller later stated that the semi-tractor had a forty-foot blind spot behind it. After the accident, W&W began installing backup alarms on all its semi-tractors and was researching how to install rearview cameras on them as well.

[8] Angela, Rickey's widow, sued IPL, W&W, Miller, and PACCAR for wrongful death. She subsequently reached settlements with W&W and Miller, and they were dismissed from the case. IPL also was granted summary judgment without opposition from Angela, leaving PACCAR as the only remaining defendant. The complaint as to PACCAR alleged that the glider kit it provided W&W was unreasonably dangerous and defective because it lacked safety features for backing up the completed semi-tractor.

[9] PACCAR moved for summary judgment, arguing that it did not manufacture the semi-tractor and that the component part or parts it made—the glider kit—was not defective or unreasonably dangerous. In response, Angela designated a report prepared by and parts of a deposition given by Bryan Bloch, an expert in motor vehicle safety. Bloch opined that the Peterbilt 389 model manufactured by PACCAR was defective in several respects: for not having as standard features a backup alarm, a rearview camera, a better mirror system, flashing backup lights, and warning labels regarding the dangers of backing up the semi-tractor.[1] Moreover, Bloch believed that the presence of these safety features would have prevented Rickey's death. Angela also cross-moved for partial summary judgment on the issue of whether PACCAR owed a duty to Rickey as a bystander and not as the ultimate purchaser or consumer of the glider kit.

---

[1] It appears Bloch may have specifically analyzed a Peterbilt 389 semi-tractor that had been fully constructed by PACCAR, not the glider kit itself. However, the completed 389 semi-tractor had the same cab and other features as the glider kit W&W used to construct its semi-tractor.

On September 11, 2017, the trial court granted PACCAR's motion for summary judgment and denied Angela's motion for partial summary judgment. On September 15, 2017, Angela filed a motion to correct error, along with a boilerplate order for the trial court to sign to set a hearing on the motion. Instead, the trial court stamped this order "DENIED" on the same day it was filed. App. Vol. II p. 19. The trial court did not enter a separate order denying the motion to correct error, and the CCS only states that it issued an "Order Denying . . . Setting Hearing Date." *Id.* at 15. Angela filed a notice of appeal on September 20, 2017. On September 28, 2017, the trial court clerk filed its notice of completion of the clerk's record for Angela's appeal. On September 29, 2017, PACCAR filed a motion with the trial court reserving its right to file a response to Angela's motion to correct error should it become necessary in the future. The case is now before this court for decision.

## Analysis

Before turning to the merits, we note a procedural issue that PACCAR hints at but neither party explores. That is, it is possible that Angela's notice of appeal was prematurely filed. PACCAR suggests that the trial court's September 15, 2017 order only denied Angela's request for a hearing on her motion to correct error and was not a ruling on the merits of that motion; the trial court never clarified whether its September 15, 2017 order was intended to be a final ruling on the motion to correct error. The time period for a deemed denial of the

motion to correct error had not yet passed when Angela filed her notice of appeal on September 20, 2017.[2]

[12] Our supreme court has made clear that an appellate court "is not deprived of jurisdiction if the notice is untimely—meaning belated or premature." *In re D.J. v. Indiana Dep't of Child Servs.*, 68 N.E.3d 574, 578 (Ind. 2017). The only two requirements for appellate jurisdiction are "(i) the trial court must have entered an appealable order, and (ii) the trial clerk must have entered the notice of completion of clerk's record on the CCS." Both requirements have been met here. An appellant who files a premature notice of appeal technically forfeits his or her right to appeal and it would not be erroneous to dismiss the appeal, but this court "has jurisdiction to disregard the forfeiture and resolve the merits." *Id.* at 579. At oral argument, counsel for PACCAR requested that this court resolve this case on the merits. In light of that request, we will do so.

### I. Summary Judgment

[13] We review a grant of summary judgment de novo. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated

---

[2] A motion to correct error is deemed denied if it is not set for hearing within forty-five days, or if it is not ruled on within thirty days of a hearing, or if it is not ruled on within forty-five days after the motion was filed "if no hearing is required . . . ." Ind. Trial Rule 53.3(A). Additionally, Trial Rule 59(E) allows an opposing party fifteen days to respond to a motion to correct error. Opinions from our supreme court and this court have addressed the appellate effect of belated grants of motions to correct error after they have been deemed denied. *See, e.g., Cavinder Elevators, Inc. v. Hall*, 726 N.E.2d 285 (Ind. 2000). That line of cases has not addressed the effect of filing a notice of appeal before a motion to correct error is either expressly or deemed denied.

evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.*

[14] A summary judgment movant bears the initial burden of demonstrating the lack of any genuine issue of fact on a dispositive issue; if the movant does so, the nonmovant then must come forward with contrary evidence showing an issue for trial. *Hughley*, 15 N.E.3d at 1003. This court must carefully assess the grant of summary judgment in order to ensure that Angela was not improperly denied her day in court. *See id.* Although summary judgment is desirable for disposing of cases where only legal issues exist, it is not the same as a summary trial and it should not be granted even if it appears the nonmovant is unlikely to prevail at trial. *Id.* "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id.* "Summary judgment should not be granted when it is necessary to weigh the evidence." *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 285 (Ind. 1991).

[15] The Indiana Product Liability Act ("IPLA") governs all actions brought against a manufacturer or seller of a product for physical harm caused by the product, "regardless of the substantive legal theory or theories upon which the action is

brought." Ind. Code §§ 34-20-1-1; 34-6-2-115. A plaintiff in a strict product liability case must prove: "(1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left the defendant's control; and (3) the defective condition was the proximate cause of the plaintiff's injuries." *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007).

[16] However, Angela does not claim the glider kit was manufactured in a defective way—i.e., it was constructed exactly as it was designed and intended to be constructed. Rather, Angela's claim is that the glider kit was defectively designed because it lacked a number of safety features. In such a case, the IPLA specifies that a negligence standard applies, not a strict liability standard. *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 209 n.2 (Ind. 2010). Specifically,

> in an action based on an alleged design defect in the product or based on an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller *failed to exercise reasonable care under the circumstances* in designing the product or in providing the warnings or instructions.

I.C. § 34-20-2-2 (emphasis added). Besides the different standard of care, a plaintiff is not required to present any additional proof in a defective design case based on negligence than in a strict liability case. *See TRW*, 936 N.E.2d at 209.

[17] The IPLA also states in part:

> A product is in a defective condition under this article if, at the time it is conveyed by the seller to another party, it is in a condition:
>
> (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and
>
> (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

I.C. § 34-20-4-1. "Unreasonably dangerous has been defined as dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics." *Baker v. Heye-Am.*, 799 N.E.2d 1135, 1140 (Ind. Ct. App. 2003), *trans. denied*; *see also* I.C. § 34-6-2-146. "A product may be dangerous in the ordinary sense but not 'unreasonably dangerous' for product liability purposes under the IPLA." *Baker*, 799 N.E.2d at 1140.

[18] The question of whether a product is unreasonably dangerous usually is a question of fact for trial. *Id.* "Moreover, reasonably expectable use, like reasonable care, involves questions concerning the ordinary prudent person, or in the case of products liability, the ordinary prudent consumer." *Id.* The manner of use required to establish "reasonably expectable use" under the circumstances of each case is a matter peculiarly within the province of a fact-finder. *Id.*

[19]    There is no dispute that the PACCAR glider kit was a component part of the semi-tractor ultimately assembled by W&W by adding an engine, transmission, and exhaust system. The IPLA applies not only to manufacturers of a final product, but also manufacturers of a component part of a product where there is proof that the part itself was defective. I.C. §§ 34-20-2-3; 34-6-2-77. PACCAR notes, in part, that because W&W, not PACCAR, was the final manufacturer of the semi-tractor, responsibility for compliance with various federal registration, certification, and safety requirements for the semi-tractor fell to W&W. *See* 49 C.F.R. § 567.5(d)(1). However, federal motor vehicle safety regulations do not preempt state law product liability claims, unless a state standard directly conflicts with federal objectives. *See Cook v. Ford Motor Co.*, 913 N.E.2d 311, 320-21 (Ind. Ct. App. 2009), *trans. denied*. Even if the glider kit complied with all federal safety regulations, it would only create a rebuttable presumption that the product was not defective. *See* I.C. § 34-20-5-1. Angela designated sufficient evidence to rebut any such presumption, if one even existed, through her expert Bloch's deposition and report, identifying several safety features that he says should have been standard on semi-tractors such as the one W&W ultimately assembled using PACCAR's glider kit. Although Bloch apparently analyzed a completed Peterbilt 389 semi-tractor and not the glider kit itself, all of the missing safety features he identified were integral to the glider kit, not the engine, transmission, and exhaust system that W&W installed to complete the semi-tractor.

[20] PACCAR also does not dispute that if it was the final manufacturer of the completed semi-tractor, Angela would have presented sufficient evidence for summary judgment purposes—through Bloch's deposition and report—to sustain a claim against PACCAR that the semi-tractor was defectively designed and unreasonably dangerous under the IPLA. This court has held, "A product may be unreasonably dangerous due to the failure to provide feasible safety features to protect the user from foreseeable mishaps." *FMC Corp. v. Brown*, 526 N.E.2d 719, 726 (Ind. Ct. App. 1988), *adopted in relevant part*, 551 N.E.2d 444 (Ind. 1990). *FMC*, however, is distinguishable from this case because it was a suit against the final manufacturer of a product, not the maker of a final product's component part.

[21] The essence of PACCAR's argument is that, as component part manufacturer, it was entitled to leave responsibility for the ultimate safety of the completed semi-tractor in the hands of W&W, or in other words that it was entirely up to W&W to order those safety features it felt was necessary for the glider kit. If W&W did not order those features, PACCAR contends, it was entirely W&W's fault for not doing so. PACCAR argues that it had no obligation to include safety features on the glider kit because it could not foresee precisely how W&W intended to use the completed semi-tractor or in what environment it would be used.

[22] There is little case law from Indiana state courts that addresses the scope of a component part manufacturer's liability under the IPLA for a completed product's lack of safety features. One that does so, though without using the

phrase "component part manufacturer," is *Shanks v. A.F.E. Industries, Inc.*, 275 Ind. 241, 416 N.E.2d 833 (1981). There, A.F.E. manufactured a grain dryer that could be used either manually, or automatically "in conjunction with other auxiliary equipment, which auxiliary equipment could assume a variety of forms and functions, depending upon the desires of the owner." *Shanks*, 275 Ind. at 245, 416 N.E.2d at 835. After the grain dryer was automated and incorporated into a grain elevator complex, a high school student was injured by a part of the grain dryer while working in the complex. The student sued A.F.E. under the IPLA, alleging: (1) A.F.E. had failed to give adequate warnings regarding the dangers of the grain dryer; and (2) the grain dryer was defectively designed because it was not equipped with safety features that allegedly could have prevented the accident. As in this case, there was no claim that the grain dryer was defectively manufactured.

[23] On appeal from a grant of judgment on the evidence in favor of A.F.E., our supreme court affirmed. Regarding the failure to warn claim, the court held that A.F.E. only had a duty to instruct and warn the owner/constructor of the grain complex, Whittington, about any inherent dangers of the grain dryer, because Whittington was a sophisticated purchaser who designed the grain complex and was fully aware of the grain dryer's operations and dangers. *Id.* at 249, 416 N.E.2d at 837-38. Any responsibility for warning the high school student, the "ultimate user" of the grain dryer, was Whittington's, not A.F.E.'s. *See id.*

The court also held that, as a matter of law, A.F.E. could not be held liable for not incorporating additional safety features into the grain dryer. The court explained:

> Because the dryer could be used as a component in a multifaceted complex such as the one created here by Whittington, to allow a jury to examine, in retrospect, the wisdom of A.F.E.'s incorporating some lights or bells into the dryer is to permit nothing more than speculation. A complex operation such as this one could have taken many forms, depending on the needs of the owner and the imagination of the designer. Here, Grammer [the company managed by Whittington that operated the grain elevator complex], through Whittington, solicited four different plans before finally selecting the one to be used. The need for any warning devices, and the circumstances surrounding their use, would, of course, depend upon the operation of the whole complex, based upon the features of its design. Thus, because the dryer could be incorporated into a variety of grain handling systems, the desirability or need for such devices could be determined only after any given type of complex had been chosen and created. Of course, A.F.E. here had no way of knowing exactly how Whittington would employ its dryer and, hence, the specific context in which such warning devices could or should be used relative to the operation of an elevator leg. By contrast, Grammer, through Whittington, had extensive knowledge of these factors, not only concerning the dryer, but concerning the entire grain handling operation.

*Id.* at 249-50, 416 N.E.2d at 838. The court also observed that the injury to the student was the result "of a situation which was especially unforeseeable to A.F.E." and there was no probative evidence that anything A.F.E. did or did

not do proximately caused or contributed to the student's injury. *Id.* at 250-51, 416 N.E.2d at 838.

[25] We conclude the evidence here is much different than in *Shanks*. Unlike the grain dryer there that could be used in a variety of unforeseeable configurations, the PACCAR glider kit was basically a complete semi-tractor that lacked only a powertrain. In other words, it is difficult if not impossible to conceive of any possible use of the glider kit that would not involve it being given a powertrain and regularly driven in reverse; and, in any conceivable use, the completed semi-tractor would have a large blind spot directly behind it that foreseeably could lead to precisely the type of tragedy that occurred here.

[26] There are several federal court cases purporting to apply the IPLA in diversity jurisdiction cases; one upon which PACCAR heavily relies is *Anderson v. P.A. Radocy & Sons, Inc.*, 865 F. Supp. 522 (N.D. Ind. 1994), *aff'd* 67 F.3d 619 (7th Cir. 1995). In that case, an electrician was electrocuted while working in a crane manufactured by Radocy that had a metal working bucket, an uninsulated crane arm, and a generator without a ground fault interrupter. The electrician's widow sued Radocy, arguing that the crane was defective under the IPLA, in part because the crane did not have a fiberglass bucket, which could have prevented the electrocution. The electrician's employer could have purchased a fiberglass bucket for the crane from Radocy as an option but chose not to do so.

[27] The federal district court granted Radocy's motion for summary judgment, which was affirmed by the Seventh Circuit. In part, the district court held that "a party cannot be liable for failing to equip its products with an optional device that the employer of the plaintiff knowingly rejected." *Anderson*, 865 F. Supp. at 531 (citing *Scallan v. Duriron Co., Inc.*, 11 F.3d 1249, 1254 (5th Cir. 1994)). Additionally, the district court held "a product is not defective for failing to do that which it was not designed to do." *Id.* (citing *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 685 (Ind. Ct. App. 1991), *trans. denied*). Thus, according to the court, "the metal basket, metal arm, and generator were not intended to prevent electrical shock or fatal electrocution, and therefore, the products are not defective." *Id.*

[28] We first note that the district court's holding that "a product is not defective for failing to do that which it was not designed to do" is an incorrect or incomplete statement of current Indiana law. Clearly, under Indiana Code Section 34-20-2-2, a product may be designed in such a way that it is unreasonably unsafe and defective for the product's intended or expected use. *See Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 281 (Ind. 1983) (holding that a "defect" for purposes of IPLA "can be that the product was defectively designed, defectively manufactured, or that the manufacturer failed to supply adequate warnings or instructions as to the dangers associated with its use"). That is the nature of Angela's claim against PACCAR.

[29] As for the court's holding regarding optional safety features, *Anderson* specifically involved an injury to an employee of the company that bought the

product at issue. Rickey was not an employee of W&W and did not have a direct relationship with the company that ordered the glider kit. Moreover, even if we assume that W&W knowingly rejected optional safety features for the glider kit, we are not convinced that this necessarily absolves PACCAR of all responsibility for the lack of safety features. In other words, it should be a question of fact as to whether it was reasonable for PACCAR to put a product into the stream of commerce that lacked one or several or all of those features.

[30]     We find support for this proposition in *Bexiga v. Havir Mfg. Corp.*, 290 A.2d 281 (N.J. 1972). In that case, the plaintiff was injured by a punch press that lacked any safety features, and he sued the punch press manufacturer. The defendant argued that it was customary in the trade for any safety devices on a punch press to be installed by its purchaser. The New Jersey Supreme Court nonetheless held that the manufacturer could be held liable for its failure to design and install at least one safety feature that would have been appropriate for any normal operation of the machine. *Bexiga*, 290 A.2d at 285. Of particular interest here, the court stated:

> Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, *the fact that he expects that someone else will install such devices should not immunize him*. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. . . .

> We hold that where there is an unreasonable risk of harm to the user of a machine which has no protective safety device, as here, the jury may infer that the machine was defective in design unless it finds that the incorporation by the manufacturer of a safety device would render the machine unusable for its intended purposes.

*Id.* (emphasis added). We are persuaded by this reasoning that if it was feasible for PACCAR to install as a standard feature any of the several safety measures Angela claims should have been installed in the glider kit, and such feature or features would not have detracted from the glider kit's use in any conceivable configuration, a fact-finder may decide PACCAR is liable to Angela for a failure to include it or them, rather than leaving the safety of a completed semi-tractor entirely to the "haphazard" choices of companies like W&W.[3] It would all depend upon a fact-finder's determination of whether PACCAR's decision to make a certain feature optional rather than standard was a reasonable decision under the circumstances.

---

[3] Our supreme court also has stated, "Certainly the manufacturer of a product may not design or manufacture a product with a latent flaw therein but escape liability for an injury attributable to that flaw simply by selling the product to an intermediate party, such as an employer who intends to use the product in a manufacturing operation." *Hoffman*, 448 N.E.2d at 282. The court also disapproved of allowing a manufacturer of a product to escape liability for injuries caused by its defectively designed or manufactured product by selling it to "an intervening employer and leaving that party with the duty to correct the defect . . . ." *Id. Hoffman* specifically dealt with an injury to an employee of a company that bought an allegedly defective product and not component manufacturer liability. Nevertheless, the language of the opinion strongly suggests the court also would not have approved of a component part manufacturer attempting to foist all responsibility for a final product's safety onto the final manufacturer, where an injury was caused that could have been avoided but for a design defect in the component part.

[31] By comparison, we note the case of *Verge v. Ford Motor Co.*, 581 F.2d 384 (3rd Cir. 1978). There, the plaintiff was injured when a garbage truck backed into him. The plaintiff sued Ford, the manufacturer of the truck's cab and chassis, alleging it was unsafe because it lacked a backup alarm. A different entity had converted the cab and chassis into a garbage truck. The court held that Ford was entitled to judgment notwithstanding the verdict. The court concluded that the company that converted the cab and chassis into a garbage truck, and not Ford, was responsible for the lack of a backup alarm. *Id.* at 388-89. It noted that the cab and chassis design was general purpose and could be used in various ways by purchasers of the cab and chassis, including in configurations where there was no obstruction of the driver's rear view (such as for a flatbed truck) and thus no need for a backup alarm. *Id.* Here, the designated evidence indicates that there was inevitably a significant blind spot behind any semi-tractor constructed using PACCAR's glider kit, regardless of its ultimate use.

[32] PACCAR also relies heavily upon Section 5 of the Restatement (Third) of Torts, Product Liability, and commentary to that provision and cases cited therein. This section governs the liability of manufacturers of component parts and largely parallels the language of the IPLA regarding component parts. The Restatement drafters observed in part,

> [C]omponent sellers should not be liable when the component itself is not defective as defined in this Chapter. If the component is not itself defective, it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective.

Restatement (Third) of Torts: Product Liability § 5 cmt. (a) (1998).

[33]    The drafters also stated,

> Product components include products that can be put to different uses depending on how they are integrated into other products. For example, the chassis of a truck can be put to a variety of different uses. A truck chassis may ultimately be used with a cement mixer or a garbage compaction unit or in a flat-bed truck. Similarly, an engine for industrial machines may be adapted to a variety of different industrial uses. A seller ordinarily is not liable for failing to incorporate a safety feature that is *peculiar to the specific adaptation* for which another utilizes the incomplete product. A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation.

*Id.*, cmt. (d) (emphasis added). Again, however, the designated evidence indicates that there are no "peculiar" adaptations of the PACCAR glider kit in which there would not be a significant danger associated with it with respect to the event that occurred here. The glider kit was intended for use in motorized vehicles that would be repeatedly backed up; Angela has designated evidence that its design was lacking with respect to backup safety, and that defect or defects proximately caused Rickey's death. Also, there is no evidence that W&W modified or altered the glider kit to adapt it to a use not contemplated by PACCAR; it was used precisely as intended.

[34]    We find the following Restatement illustration interesting and more parallel to this case than the above comment:

ABC Vinyl, Inc., sells vinyl swimming-pool liners for use in above-ground swimming pools. ABC manufactures the liners without depth markers. XYZ Pools, Inc., manufactures and sells above-ground swimming pools. XYZ installs a pool with an ABC liner at the home of Roberta. Jack, while visiting Roberta, dives into the shallow portion of the pool that appears to him to be eight feet deep. In reality the water is only four feet deep. Jack hits his head on the bottom and suffers harm. If a court finds that the absence of the depth markers renders the design of the liner defective . . ., ABC is subject to liability to Jack. The fact that the liner is a component of the above-ground swimming pool and has been integrated into a specific swimming pool does not insulate ABC from liability for selling a component product that is defectively designed for all swimming-pool installations. XYZ is also subject to liability to Jack as the seller of a pool with a defectively designed liner.

*Id.*, illustration (3). In this scenario, PACCAR is an analogous position to ABC because it designed and constructed a glider kit that was defective for all possible uses, and W&W is in the same position as XYZ for integrating that part into a completed semi-tractor.[4] The Restatement does not support PACCAR's case.

---

[4] This illustration seems to be based on *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107 (3rd Cir. 1992), *cert. denied*. The court there also observed:

> Moreover, we are not persuaded by the contention that a pool liner is an inert, innocuous thing simply because by itself, it is physically incapable of injuring a consumer. To hold otherwise implies that "unreasonably dangerous" . . . requires that the product itself actually exert the injury-causing, physical force. But even dynamite is inert, unless ignited. Although a replacement pool liner does not explode, crush, drive, or exert any other physical force, it may through a chain of not so remarkable events cause serious injuries.

*Fleck*, 981 F.2d at 119. Here, likewise, the glider kit standing alone is not dangerous, but "it may through a chain of not so remarkable events" become that way—namely, when a powertrain is added to it and it becomes an operational semi-tractor.

[35] We also note the Restatement illustration's observation that *both* ABC and XYZ could be liable for the plaintiff's injuries. Such a result would be consistent with the Indiana Comparative Fault Act, which applies to actions under the IPLA. *See* I.C. § 34-20-8-1; *Green v. Ford Motor Co.*, 942 N.E.2d 791, 794 (Ind. 2011). "The legislature has thus directed that a broad range of potentially causative conduct initially may be considered by the fact-finder but that the jury may allocate comparative fault only to those actors whose fault was a proximate cause of the claimed injury." *Green*, 942 N.E.2d at 795. In a comparative fault case,

> "the jury is first required to decide whether an actor's negligence was a proximate cause of the plaintiff's injury." [*Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 109 (Ind. 2002)]. "Whether or not proximate cause exists is primarily a question of foreseeability." *Id.* at 108. The fact-finder must evaluate whether the injury "is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Id.* (quoting *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000)). Fault may not be imposed "on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission." *Id.* The determination and allocation of each party's proportionate fault "is a question for the trier of fact, except where there is no dispute in the evidence and the fact finder could come to only one conclusion." *Walters v. Dean*, 497 N.E.2d 247, 254 (Ind. Ct. App. 1986).

*Id.*

[36] Although *Green* was a case involving the alleged comparative fault of the plaintiff in a product liability case, there is no bar to applying the Comparative Fault Act in a case involving a component part manufacturer and a final product manufacturer. As such, there is no inherent reason why the fault or responsibility for the semi-tractor's safety must fall exclusively either to PACCAR or to W&W, or why they cannot both be liable for Rickey's death with respect to the semi-tractor's safety. The question would be whether PACCAR was an original negligent actor in the glider kit's design and set in motion a chain of events that led to a foreseeable injury as a natural and probable consequence of that design. *See id.* The issue of proximate cause ordinarily is one for the jury to decide. *Id.*

[37] Angela designated evidence, through Bloch, of several alleged design flaws in the glider kit PACCAR sold. Our holding today is that it was then incumbent upon PACCAR to designate undisputed evidence that it would have not been feasible, or that it would have been unreasonable, for PACCAR to have addressed *any* of those flaws in the glider kit, rather than leaving it entirely for W&W to address. PACCAR failed to do so and, therefore, failed to negate all elements of Angela's product liability cause of action. Thus, PACCAR was not entitled to summary judgment. *See Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1189 (Ind. 2016) (noting that under Indiana law, summary judgment movant has the burden of affirmatively negating an opponent's claim).

[38] With respect to making an audible backup alarm a standard feature on its glider kits, PACCAR claims that an audible backup alarm might not be feasible or

desirable in all environments. It directs us to a statement by the federal Mine Safety and Health Administration ("MSHA") that conventional backup alarms in a mining environment might be too common "and therefore be less noticeable and effective as a warning." SAFETY STANDARDS FOR LOADING, HAULING, AND DUMPING AND MACHINERY AND EQUIPMENT AT METAL AND NONMETAL MINES, 53 Fed. Reg. 32,496, 32,513 (1988). PACCAR seems to imply that if its glider kit was used to construct semi-tractors frequently used in a mining environment, which is something PACCAR would be unaware of when it made the glider kit, it would be inadvisable to equip it with a standard backup alarm. However, the MSHA was not recommending that trucks in a mining environment not have backup alarms. Rather, it was suggesting (but not requiring) the installation of more advanced backup alarms, ones that would be triggered only if something was detected behind the truck, for example, by an infrared sensor. *See id.* Also, just because backup alarms might become "less effective" in a mining environment does not mean that they are entirely ineffective, or that one should not be installed if a truck is to be used in a mining environment. There is a question of fact as to whether PACCAR should have made a backup alarm a standard feature in its glider kits.

[39] Regarding rearview cameras, PACCAR states, "it is well known in the trucking industry that the best place to put the camera is on the trailer—not the cab" and that it did not construct or provide any parts for W&W's trailers. Appellee's Br. p. 33. PACCAR does not cite any part of the record for this assertion regarding

what is "well known in the trucking industry." Placing a rearview camera only on a trailer would not address the common problem of backing up a semi-tractor to be attached to a trailer, as happened here. PACCAR did designate evidence that its optional "SmartNav" dash screen display system, which could be used with a rearview camera in some configurations, was in fact not compatible with the engine W&W intended to and did install with the glider kit it ordered. However, this does not necessarily answer the question of whether it was feasible for PACCAR to develop and install a rearview camera system for all of its glider kits, independent of the "SmartNav" system.

[40] As for a backup strobe light, PACCAR notes that the glider kit came with wiring to allow W&W to install such a light, but W&W did not do so. Again, however, the fact question here is whether it was unreasonable for PACCAR to design, construct, and put into the stream of commerce a glider kit that lacked backup lights as a standard feature, rather than leaving it to chance and the final semi-tractor manufacturer's whim to decide whether to install them. Similarly, it is a question of fact as to whether it was unreasonable for PACCAR to not include warning labels in the glider kit cab alerting whoever was driving the semi-tractor to the dangers of backing it up.

[41] It is possible that PACCAR designated sufficient evidence that its failure to include a standard rear window in its glider kit cabs was not a proximate cause of Rickey's death. That is because of the "headache rack" W&W installed on the cab, which would have blocked a rear window and negated its benefit as a safety feature. However, that would still leave at least four safety features on

which there is conflicting evidence and inferences as to whether PACCAR should have installed them as standard parts of the glider kit and whether its failure to do so was a proximate cause of Rickey's death. Consequently, the trial court erred in granting PACCAR's motion for summary judgment.

## II. Cross-Motion for Partial Summary Judgment

[42] Angela also contends the trial court erred in denying her cross-motion for partial summary judgment. Specifically, her cross-motion sought a declaration that PACCAR owed Rickey a duty to design and manufacture a safe product. The IPLA provides that it applies to any action brought by a "consumer" against a product manufacturer, regardless of the substantive legal theory underlying the claim. I.C. § 34-20-1-1. It also includes within the definition of "consumer" "any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use." I.C. § 34-6-2-29. PACCAR concedes in its brief that Rickey is a "consumer" for purposes of the IPLA. There is no dispute that he falls within the "bystander" provision of the IPLA and that he was injured during the glider kit's reasonably expected use after its final delivery and integration into the semi-tractor. *Cf. Vaughn v. Daniels Co. (West Virginia), Inc.*, 841 N.E.2d 1133, 1142-43 (Ind. 2006) (holding IPLA does not apply to person injured before final delivery of product in a state contemplated by buyer and seller). Thus, although it may be unnecessary on remand for the trial court to enter partial summary judgment, there should be no dispute that the IPLA applies to Angela's claims against PACCAR.

# Conclusion

PACCAR's position as a component manufacturer and not the final manufacturer of the semi-tractor that killed Rickey does not immunize it from liability under the IPLA; nor may PACCAR automatically transfer all responsibility for the semi-tractor's safety to W&W. Angela has designated sufficient evidence for summary judgment purposes that there were several safety features PACCAR reasonably could have incorporated into its glider kits that might have prevented Rickey's death. There also is no dispute that Rickey was a "consumer" of PACCAR's product for purposes of the IPLA. We reverse the grant of summary judgment in favor of PACCAR and remand for further proceedings consistent with this opinion.

Reversed and remanded.

Vaidik, C.J., concurs.
Mathias, J., concurs with separate opinion.

Angela Brewer, Individually and
as Personal Representative of the
Estate of Rickey A. Brewer,
Deceased,

*Appellant-Plaintiff,*

v.

PACCAR, Inc. d/b/a
PETERBILT MOTORS CO.,

*Appellee-Defendant.*

Court of Appeals Case No.
55A05-1709-CT-2168

**Mathias, Judge, concurring.**

[45] While I agree with my colleagues that Angela has designated sufficient evidence for summary judgment purposes, I write to express my reservations about the broad legal discussion that reaches this result. W&W, a sophisticated trucking company, explicitly ordered the glider kit from PACCAR without the optional rear window or backup alarm. Moreover, W&W ordered the glider kit with wiring to install a backup strobe light, but the strobe light was never installed. Thus, in my view, W&W, a sophisticated user, was well aware of any potential danger posed by PACCAR's glider kit when it assembled the semi-tractor. And on appeal, the core of PACCAR's arguments is a thinly disguised sophisticated user defense.

Our court has consistently held that the question of whether or not a manufacturer has discharged its duty under the sophisticated user exception is appropriately a question for the trier of fact. *See, e.g., Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 164 (Ind. Ct. App. 1997), *trans. denied*. Accordingly, I agree that summary judgment was inappropriate here, and the matter should be remanded to the trial court where PACCAR can appropriately make its sophisticated user argument before a jury.